IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 22-306 |
| STEFANO ZANETTI | |

<u>SENTENCING MEMORANDUM</u>

AND NOW comes the United States of America by its attorneys, Troy Rivetti, United States Attorney for the Western District of Pennsylvania, and Jeffrey R. Bengel, Assistant United States Attorney for said district, and respectfully files this sentencing memorandum.

The defendant, Stefano Zanetti, purported to be a successful businessman in Panama, running a business called Luxury Water Sports. But that was not Zanetti's real business. In reality, Zanetti was the lynchpin in an international conspiracy designed to systematically steal money from elderly victims in the United States. Believing himself beyond the reach of United States law enforcement, and undeterred by the arrests of at least ten of the underlings whom he had recruited to pick up money directly from his elderly victims, Zanetti lived large on the proceeds of his crimes for years—enjoying beach-front property, driving a Porsche, owning boats and jet skis, and buying cocaine. Only this criminal case, and Zanetti's extradition to the United States, have put an end to his criminal conduct. Now, Zanetti has pled guilty to conspiracy to commit wire fraud and money laundering, and his guideline range at sentencing is 151 to 188 months of imprisonment. To account for the serious nature of the offense, achieve general deterrence, afford just punishment, and promote respect for the law, the United States requests a sentence of at least 188 months of imprisonment.

1



*Zanetti pictured on a jet ski in connection with an article about*
*Luxury Watersports*

FACTUAL AND PROCEDURAL BACKGROUND

This case involves a scheme to defraud that specifically targeted elderly victims in Western Pennsylvania and other states across the country. For the victims, the scheme began when they received a phone call from a member of the conspiracy, impersonating one of their grandchildren. The "grandchild" told the victim that they had been detained as a result of a reckless driving accident, in which they had collided with a car driven by someone else—in many cases, a pregnant woman. Fortunately, the "grandchild" continued, an attorney had agreed to represent them. Another conspirator, now impersonating the attorney, spoke with the victim, informing them that their grandchild needed money—usually thousands of dollars—in order to be released from jail. Cash was preferable, the attorney continued, and for the victim's convenience, the "attorney" could send a bail-bondsman directly to the victim's home to retrieve it. But it was important, explained the "attorney," that the victim abide by the "gag order" on the case. The victim should not tell anyone—their spouse, their children, or any inquisitive bank tellers—about their grandchild's detention and the thousands of dollars that they were about to pay toward their bond. When another

2

member of the conspiracy, now impersonating a bail-bondsman, arrived at the door, most victims simply handed over the money.

This scheme was designed to intentionally prey upon the love and concern that grandparents feel for their grandchildren. The emotional distress caused to the victim was not an unintentional by-product of the fraud; it was an essential piece. By causing the victim to worry about the safety of their grandchild, placing pressure on them, and isolating them through the "gag order," the members of the scheme could induce them to part with thousands, and sometimes tens-of-thousands, of dollars. The more distressed the victim, the more likely they were to pay. Victims interviewed as part of this investigation described feeling embarrassed, taken advantage of, less trusting, and less safe.

The scheme was executed by an international conspiracy. The calls to the victims were made from call centers, primarily located in Montreal, Quebec. There, conspirators reading from scripts—some playing the "grandchild" while others, known as "closers," played the "attorneys"—frightened the elderly victims into paying the "bond." At the same time Zanetti, a Canadian citizen living in Panama, was coordinating with the call centers and arranging for the pickup of the funds from the victims' homes in the United States. Once picked up by the "bondsmen," the funds would be delivered to the "safehouse," another conspirator who was tasked with collecting the victim funds until they could be converted to cryptocurrency and transferred to Panama or other international locations. Using Signal, the encrypted messaging application, Zanetti sent instructions to the conspirators in the United States. In some messages, Zanetti provided the name of a victim, their home address, and the amount of money that the "bondsman" was supposed to collect. Other instructions were more focused on *how* the "bondsmen" were supposed to collect the money. These included directions to drive past the victims' homes before approaching, park cars blocks away where they could not be seen, use aliases when going to the victims' doors, look for cameras, and avoid gated communities. To assist with the logistics and laundering of victim

3

funds, Zanetti worked with other conspirators located in Panama, including Samuel David Ferrer Avila and Cesar Javier Chourio Morante.

The government's investigation indicates that Zanetti had been involved in the organization for many years. For example, according to a federal investigation run out of the Middle District of Florida, in 2019, Zanetti attempted to claim more than one-hundred-thousand dollars in grandparent scam proceeds that had been seized in Colombia. But the incidents that are the primary focus of this case date to August and September 2021, when two "bondsmen" connected to Zanetti's organization were arrested attempting to pick up money from elderly victims of the scam. The first, Isaac Falak, was arrested in the state of Idaho in August 2021. Falak's travel to the United States from Panama was associated with the email address of a third person who, in turn, had engaged in financial transactions with Samuel Ferrer Avila. After obtaining a search warrant for a phone seized from Falak, federal investigators discovered a confirmation email indicating that Falak's Idaho travel had been managed in part by someone named Cesar Chourio— now identified as Cesar Chourio Morante. The second "bondsman," Derek Allman, was arrested by police in Walton County, Georgia. Inside his phone, agents discovered that Allman had been taking directions from a Panamanian phone number associated with the Signal account "Loyalty." The user of that account was subsequently identified as Stefano Zanetti.

During the last week of September 2021, Roderick Feurtado, Tarek Bouanane, and Roberto Gutierrez arrived in Pittsburgh to carry out the scheme. Bouanane and Gutierrez were the "bondsmen," who picked up thousands or tens of thousands of dollars in cash directly from the elderly victims at their homes. Pittsburgh was the first stop for Gutierrez as a member of the conspiracy. Bouanane, on the other hand, had already picked up money from victims in New Hampshire and dropped $25,000 of the stolen cash in New York City. Those funds had been converted to cryptocurrency in form of USDT and sent to an account belonging to Samuel Ferrer Avila. Feurtado was the "safehouse." In that role, he helped direct the activities of the

"bondsmen," collected the cash that they had stolen from the elderly victims, and arranged to transfer it to other members of the conspiracy. Feurtado had recruited both Bouanane and Gutierrez as members of the conspiracy and had direct ties to its managers in Panama, including Stefano Zanetti and Samuel Ferrer Avila. Zanetti, using the Signal account "Loyalty," and Ferrer Avila, using the Signal account "Salvatore99," oversaw the operation from Panama. Voice messages sent from Loyalty suggest that, for at least part of that period, Zanetti and Ferrer Avila worked together in person.

On September 29, 2021, Bethel Park and Upper St. Clair Police arrested Gutierrez at the door of a victim, from whom he'd been trying collect $30,000 in cash. Later that evening, the Pennsylvania State Police located Feurtado at a hotel near the airport, in possession of more than $220,000 in victim money. And, the following day, they found Bouanane at a hotel on the Northshore—also in possession of thousands of dollars in cash. When agents searched Feurtado's phone, they discovered WhatsApp messages between Feurtado and Ferrer Avila. Some of these messages, like those that follow, depicted Zanetti and his associates carrying out the fraud at a poolside, near the beach.





8910 (Sammuel Ferrer)    ✓ Read    9/25/2021 7:52:58 PM

Another video shows Zanetti behind the wheel of his Porsche:



The arrests of Feurtado, Bouanane, and Gutierrez did not put an end to the conspiracy. Evidence obtained by the government indicates that, following the losses suffered in Pittsburgh, the organization's Canadian ringleaders—including the lead defendant, Gareth West—visited Zanetti in Panama to discuss the operation. A photo from West's Instagram account shows him, Zanetti, and others riding together in a small plane:



Then, while pursuing the case against Feurtado, Bouanane, and Gutierrez, agents learned that another "bondsman," Adrian Orozco Perez, had been arrested on February 28, 2022 in Walton County, Georgia—the same county where Derek Allman had been previously arrested with a contact for "Loyalty" in his phone. When agents began investigating Orozco Perez, they learned that, during the month of February 2022, he had also traveled to both Western Pennsylvania and Tennessee, during periods when local seniors had been losing money to the scam. Orozco Perez's phone contained evidence connecting him to conspirators in the United States and abroad. One of his contacts was for Cesar Chourio, a man pictured riding a jet ski apparently identical to one on which Stefano Zanetti had been previously photographed.

Orozco Perez also had as contacts numbers attributed to Yhonlester Da Silva Quintero and Hector Escorihuela Gil, two individuals that agents already suspected of having traveled to

7

Pittsburgh to execute the scam. Escorihuela Gil was saved in Orozco Perez's phone under a Spanish word related to that for "vault." Flight, hotel, and rental car records associated with Da Silva Quintero and Escorihuela Gil placed them in Pittsburgh, Georgia, and Tennessee during the periods when the scam was active those locations. So too did the historical cell-site information associated with their phone numbers. More than a week after the arrest of Orozco Perez at a victim's door, yet another courier, Nelson Guzman-Gonzalez, was arrested in Georgia attempting to pick up cash from a victim. The numbers belonging to Escorihuela Gil and Da Silva Quintero were saved in Guzman-Gonzalez's phone and had connected to cell-towers in the area. When investigators later searched devices seized from Da Silva Quintero and Escorihuela Gil incident to their arrests, they found evidence indicating that Da Silva Quintero was a "bondsman" and Escorihuela Gil was a "safehouse."

As they moved around the country executing the scheme, Orozco Perez, Da Silva Quintero, and Escorihuela Gil had received instructions from Zanetti, using the new Signal account moneyyyyyyy; Ferrer Avila, using the new Signal account Luciano$ (but the same avatar as had been attached to the Salvatore99 account); and Chourio Morante, using the Signal account Floyd Markc. While picking up money from victims in Pittsburgh, Orozco Perez had sent money directly to Chourio Morante in Panama, via Western Union. Escorihuela Gil's phone revealed later conversations with Chourio Morante on the Floyd Markc Signal account about a "bondsman" named Custudio Gomes-Silva, who was arrested in August 2022 while trying to pick up cash from a victim in Kansas. Inside Gomes-Silva's phone, agents found recordings from Stefano Zanetti, sent from the Signal account moneyyy.

Feurtado, Bouanane, and Gutierrez—the individuals who targeted Pittsburgh victims in September 2021—have all been convicted of conspiracy to commit wire fraud in the Western District of Pennsylvania. Gutierrez pled guilty and received a sentence of 46 months of imprisonment. Feurtado and Bouanane were convicted at trial and received sentences of 120

8

months and 46 months of imprisonment, respectively. Orozco Perez, Da Silva Quintero, and Escorihuela Gil—the individuals who targeted Pittsburgh victims in February 2022—have similarly been convicted of conspiracy to commit wire fraud. Orozco Perez, who was also convicted of money laundering, received a sentence of 36 months of imprisonment. Escorihuela Gil and Da Silva Quintero received sentences of 36 months and 30 months of imprisonment, respectively. Finally, in August 2023, Zanetti, Ferrer Avila, and Chourio Morante were extradited from Panama to the United States. All three have pled guilty to conspiracy to commit wire fraud and conspiracy to commit money laundering. Ferrer Avila and Chourio Morante each received sentences of 48 months of imprisonment.

Zanetti is far more culpable than each of these co-conspirators, and his plea agreement reflects that fact. Zanetti has stipulated to loss between $1,500,000 and $3,500,000. That stipulation is based on a spreadsheet shared with Zanetti during plea negotiations and corroborated by additional evidence from the case. Indeed, during only three days in September 2021, Zanetti's organization collected more than $200,000 from victims in Pittsburgh. Contemporaneous recordings played at the trial of Feurtado and Bouanane make clear that Zanetti, who had been participating in the scheme for years, operated multiple "crews." In Exhibit 49L from that trial, Zanetti told Feurtado and Bouanane that they should be doing "about 50K a day, roughly, sometimes it'll be more." *See also* Exhibit 53 at 8 (Loyalty: "[I] was just in [A]tlanta did 500k there.") Exhibit 53O ("[T]rust me, there's money to be made 'cause there's a lot of money doing this."). Under these circumstances, it is no surprise that the Indictment charging the operators of Zanetti's Canadian call centers alleges more than $21 million in victim losses. Zanetti's agreement contains additional, well-founded stipulations that his crimes targeted a large number of vulnerable victims, were committed in part from outside the United States, and resulted from his leadership in the organization. His applicable guideline range is 151 to 188 months. For the reasons below, the United States requests a sentence of at least 188 months of imprisonment.

<u>ARGUMENT</u>

The Court shall impose a sentence sufficient but not greater than necessary to comply with the purposes set forth by Congress in 18 U.S.C. § 3553(a). First, the Court's sentence must account for the seriousness of, and provide just punishment for, the offense. As the Court has already recognized in sentencing Zanetti's co-conspirators, this is a very serious offense that involves the exploitation of elderly victims and the love that they feel for their grandchildren. To induce the victims to part with thousands or tens-of-thousands of dollars, Zanetti's organization lied to, frightened, isolated, and pressured them. Zanetti recruited the "bondsmen" and arranged to take the money from the victims in person at their addresses, thereby making them feel unsafe in their homes. And he did all that out of greed—simply to make money for himself and his conspirators. The victims in this case lost hard-earned money, which they planned to rely on in retirement or gift to their grandchildren, so that Zanetti could party, ride jet skis, live near the ocean, and drive a sportscar. This is a serious offense that warrants a serious punishment.

Second, the sentences in this case should afford adequate deterrence to criminal conduct. Every "bondsman" and "safehouse" charged in these related cases has maintained that they did not know the substance of the communications made directly to the elderly victims. Zanetti, on the other hand, had perfect knowledge of the entire scheme. The government's evidence suggests that Zanetti had the connection to the Canadian call centers, where he had previously dealt directly with victims and excelled as a "closer." He knew exactly what lies the victims were being told. In his most recent role, he orchestrated the pickups directly from the victims, devising the instructions for the "bondsmen" about avoiding detection. These were honed, no doubt, through a series of bondsman arrests. This memorandum, which no doubt represents only a sliver of Zanetti's activity over the years, details ten. Notwithstanding these arrests, Zanetti persisted in the crime. Whereas the bondsmen exposed themselves to arrest in the United States, Zanetti must have believed that he was protected in Panama and sufficiently hidden behind his aliases. In effect,

10

Zanetti was taking a risk that he could make money through the scam, without being identified, charged, arrested, and convicted. Now that all of that has occurred, the sentence in this case must be serious enough to affect the calculus of others who might make a similar bet. If convicted, individuals who engage for years in brazen, deliberate, predatory, and unrepentant criminal activity should receive a sentence that demonstrates to others that the crime is not worth it.

Third, the Court should remain cognizant of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). To date, the most significant sentence imposed in this case has been 120 months of imprisonment for Roderick Feurtado. Zanetti—who recruited Feurtado, directed his movements, knew the details of the scheme, participated for much longer, and caused greater losses—should receive a significantly longer sentence.

Finally, the sentences in these cases should provide for restitution. Zanetti has disclosed almost nothing about his financial situation in connection with his presentence investigation. Nonetheless, the Court should impose full restitution for all of the victims identified in the Judgment of Samuel David Ferrer Avila, plus all of the victims identified in the Judgment of Roderick Feurtado, for a total of $780,870.

This case involves an international conspiracy to defraud vulnerable members of the community, in Pittsburgh and elsewhere. As the Court has observed while sentencing Zanetti's co-conspirators, the guidelines do not capture the full harm caused by this elder fraud offense. If that is true of the "bondsmen," then it is doubly true of Stefano Zanetti, who knowingly preyed upon vulnerable victims for years, simply to satisfy his own greed. The United States respectfully respects that the Court impose a sentence at the top of his guideline range, of at least 188 months of imprisonment.

Respectfully submitted,

TROY RIVETTI
United States Attorney

*s/Jeffrey R. Bengel*
JEFFREY R. BENGEL
Assistant U.S. Attorney
Pittsburgh, Pennsylvania 15219
DC ID No. 1018621