# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA )
)
) Criminal No. 25-225
vs. )
)
STEFANO ZANETTI ) Judge: J. Nicholas Ranjan
)
)

## SENTENCING MEMORANDUM

## I. INTRODUCTION

AND NOW, comes Defendant, Stefano Zanetti, by and through his attorney, Steven C. Townsend, Esquire, and submits this Sentencing Memorandum in support of a sentence of 120 months, a variance which is below the advisory guideline range. Mr. Zanetti also requests that no term of supervised release be imposed as he is not a United States Citizen and will be subject to deportation upon his release from incarceration.

This memorandum is submitted consistent with *United States v. Booker*, 543 U.S. 220 (2005), Gall v. United States, 552 U.S. 38 (2007), *Rita v. United States*, 551 U.S. 338 (2007), and *Pepper v. United States*, 562 U.S. 476 (2011).

Mr. Zanetti acknowledges the seriousness of his offense and expresses genuine remorse for his actions. He respectfully requests the Court consider the mitigating circumstances of his life, his acceptance of responsibility, his voluntary waiver of extradition, his efforts at rehabilitation while incarcerated, and the substantial sentence already served by his pretrial detention. A sentence within a range of 120 months is sufficient, but not greater than necessary,

1

to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a), taking into account (1) his personal history and characteristics, (2) the already severe guideline calculation, (3) the certainty of deportation upon completion of his custodial sentence, and (4) the fact that, unlike similarly situated defendants, Mr. Zanetti will be required to serve substantially more actual time in custody because he is ineligible for early release mechanisms routinely available to non-deportable defendants.

### A. REQUEST FOR TRANSFER TO CANADA PURSUANT TO INTERNATIONAL PRISONER TRANSFER TREATY

Mr. Zanetti respectfully requests that, he be permitted to serve his sentence in his home country of Canada. The United States and Canada are parties to a bilateral prisoner transfer treaty, codified at 18 U.S.C. § 4100 et seq., which allows for the transfer of convicted offenders to their home countries to serve their sentences.[1]

### B. THE UNITED STATES-CANADA PRISONER TRANSFER TREATY

The United States and Canada have long recognized the benefits of allowing foreign nationals convicted of crimes to serve their sentences in their home countries. The Treaty between the United States of America and Canada on the Execution of Penal Sentences (the "Transfer Treaty") provides a mechanism for the transfer of prisoners to their country of citizenship. This treaty reflects the mutual understanding that rehabilitation is best achieved when prisoners are housed near family support systems and within familiar cultural and linguistic environments.

Under 18 U.S.C. § 4100, the Attorney General, acting through the Federal Bureau of Prisons, has the authority to consent to such transfers upon application by a foreign national serving a sentence of imprisonment in the United States. Courts have consistently recognized the

---

[1] https://www.justice.gov/criminal/criminal-oia/list-participating-countriesgovernments

appropriateness of recommending or supporting such transfers where, as here, the defendant maintains strong family ties to his home country and presents no risk of flight or danger to the community.

### C. MR. ZANETTI'S STRONG TIES TO CANADA

Mr. Zanetti is a Canadian citizen who has resided in Montreal, Quebec, for the majority of his life. His elderly parents, Pietro and Bernice Zanetti, reside in Canada and have maintained weekly contact with him throughout his pretrial detention. His brother also resides in Canada. The letters submitted to the Court from his family members underscore the depth of these familial bonds and the critical role Mr. Zanetti plays as a source of emotional and practical support for his aging parents.

Prior to his arrest, Mr. Zanetti owned and operated legitimate businesses in Canada, including Luxury Water Sports Panama and Full Proof Encryption, Corporation. (PSR ¶¶ 65-66). He has a longstanding history of productive employment and community engagement in his home country. His relationship with Lluisa Gordillo, while she resides elsewhere, does not diminish his substantial connections to Canada, where his family of origin remains.

### D. REHABILITATIVE BENEFITS OF SERVING SENTENCE IN CANADA

The rehabilitative purposes of sentencing under 18 U.S.C. § 3553(a)(2)(D) are best served by permitting Mr. Zanetti to serve his sentence in Canada. Incarceration in a foreign country, distant from family support and familiar surroundings, imposes unique hardships that can impede rehabilitation. Language barriers, cultural isolation, and limited access to visits from family members all undermine the correctional goals of the sentence.

Mr. Zanetti has already demonstrated an exceptional commitment to self-improvement during his pretrial detention at the Indiana County Jail, where he has actively participated in

numerous programs including Career Development, Drug and Alcohol treatment, Re-Entry classes, Anger Management, Thinking for a Change, and the Nurturing Parenting Program. One of the many letters from program administrators at the Indiana County Jail confirms his consistent participation in outpatient substance use treatment since October 2024. **(Exhibit A, Letters & Certificates)** Placement in a Canadian correctional facility would allow him to continue this rehabilitative trajectory with the support of his family, who can regularly visit and encourage his progress. The

Canadian correctional facilities offer programming comparable to that of the United States Bureau of Prisons, and Mr. Zanetti would be eligible to participate in similar rehabilitative and educational opportunities. The proximity to his family would facilitate the maintenance of family ties, which research consistently demonstrates reduces recidivism and promotes successful reentry into society upon release.

In the event that Mr. Zanetti is required to serve his entire sentence in the United Sates, he respectfully requests that he be designated to one of the following facilities. Fort Dix, New Jersey, Danbury, Connecticut, Butner, North Carolina or Petersburg, Virgina.

### E.  NO ADVERSE IMPACT ON SENTENCING OBJECTIVES

Permitting Mr. Zanetti to serve his sentence in Canada would not undermine any of the sentencing objectives set forth in 18 U.S.C. § 3553(a). The duration of the sentence would remain unchanged, ensuring that the seriousness of the offense is reflected, just punishment is imposed, and deterrence is achieved. The only difference would be the location of incarceration—a distinction that carries no weight under the § 3553(a) factors but carries enormous significance for Mr. Zanetti's rehabilitative prospects and his family's ability to maintain contact during his incarceration.

The protection of the public is equally served regardless of whether Mr. Zanetti is incarcerated in the United States or Canada. Upon completion of his sentence, he will be subject to deportation from the United States in any event, and if he serves his sentence in Canada, he will already be in the country to which he would ultimately be removed. This eliminates any risk that he might evade immigration enforcement or reenter the United States unlawfully.

## II. THE ADVISORY GUIDELINE CALCULATION

The PSR correctly calculates a Total Offense Level of 34 and a Criminal History Category of I, resulting in an advisory guideline range of 151 to 188 months' imprisonment. (PSR ¶¶ 40, 43). Mr. Zanetti does not contest the mathematical accuracy of the guideline calculation for purposes of sentencing, but respectfully submits that the advisory range substantially overstates the punishment necessary to achieve the goals of sentencing in this case when viewed through the lens of § 3553(a).

## III. TITLE 18 U.S.C. § 3553(a) FACTORS

The factors cited under 18 United States Code, Section 3553 support Mr. Zanett's requested sentence.

1. **18 U.S.C. § 3553(a)(1): The nature and circumstances of the offense and the history and characteristics of the defendant.**

The sentence must take into consideration the nature and circumstances of the offense, as well as the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Mr. Zanetti incorporates Part A of the Final Presentence Investigation Report (PSR) dated August 10, 2025. It should be noted that Mr. Zanetti has expressed his willingness to plead guilty at the onset of the Indictment. He, unlike others in the conspiracy, never intended to litigate his conduct by a trial. He fully accepts responsibility for his conduct, as evidenced by his timely plea of guilty to

Counts 1 and 2 of the Indictment. **(Exhibit B, Defendant's Letter)** By pleading guilty, Mr. Zanetti has saved the government and the Court the significant time and expense of a complex trial, and—most importantly—has spared the elderly victims the trauma and anxiety of testifying.

The offense conduct is serious and involved a fraud scheme that caused significant financial harm to numerous victims, many of whom were elderly. Mr. Zanetti does not minimize that harm. At the same time, the guideline calculation already accounts for the seriousness of the offense through substantial enhancements, including loss amount, role in the offense, and vulnerable victims. The resulting offense level of 34 reflects an extraordinarily punitive assessment that captures the gravity of the conduct without the need for additional upward adjustment in the form of an excessive custodial term.

As outlined in the PSR, the parties have stipulated to a three-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1, resulting in a Total Offense Level of 34. This reflects Mr. Zanetti's genuine contrition and his willingness to be held accountable for his actions.

Mr. Zanetti is a 43-year-old Canadian citizen with no prior criminal history, resulting in a Criminal History Category of I. This is his first and only encounter with the criminal justice system. Mr. Zanetti was raised in a stable, two-parent household in Montreal, Canada, describing his childhood as "great" and free of abuse or neglect. He maintains close weekly contact with his elderly parents and monthly contact with his brother, demonstrating strong and supportive family connections. (PSR ¶¶ 49-51). Mr. Zanetti has been in a committed relationship with Lluisa Gordillo since approximately 2010 and has acted as a supportive figure in the lives of her two children. (PSR ¶ 52-53). Letters submitted by his family, including his aging parents

Pietro and Bernice and his son Sebastian, paint a portrait of a man defined by his love and dedication to his family. They describe him as a "conscientious, responsible and dedicated individual," a "loving committed husband," and a "devoted father" who provided for his stepchildren's needs, "most importantly their education." His son Sebastian writes that Stefano taught him "how to be a man of integrity...to lead with compassion, to value family above all else." He will be separated from his family for the duration of any custodial sentence and permanently removed from the United States upon completion of that sentence. **(Exhibit C)**

Prior to his involvement in this offense, Mr. Zanetti was a productive individual. For years, he owned and operated legitimate businesses, including Luxury Water Sports Panama and Full Proof Encryption, Corporation. (PSR ¶¶ 65-66). This history indicates that his criminal conduct was an aberration, not a reflection of his character.

While the advisory guideline range is calculated at 151 to 188 months, a sentence below this range, 120 months, is warranted based on a holistic consideration of the § 3553(a) factors. Mr. Zanetti has been detained since his initial appearance on August 30, 2023. As of his sentencing date, he will have served approximately 28 months in custody at the Indiana County Jail. This period of pretrial detention has been a substantial punishment in itself. For a first-time offender, the harsh reality of incarceration has been a profound wake-up call. This lengthy period of detention should be credited as a significant factor in achieving the goals of specific deterrence and just punishment.

2. **18 U.S.C. § 3553(a)(2)(A): The need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.**

A substantial term of imprisonment unquestionably reflects the seriousness of the offense and promotes respect for the law. However, the Court must ensure that the punishment imposed

is just—not excessive. A sentence at the low end of the guideline range, or a modest variance below that range, would still constitute a severe punishment, particularly when combined with mandatory restitution, the stigma of a federal felony conviction, and permanent removal from the United States.

3. **18 U.S.C. § 3553(a)(2)(B): The need for the sentence imposed to afford adequate deterrence**

General deterrence is fully satisfied by the certainty of a lengthy federal prison sentence followed by deportation. Specific deterrence is also strongly present: Mr. Zanetti will never again reside in the United States, will be barred from lawful return, and will be permanently separated from the environment in which the offense occurred. These consequences dramatically reduce any risk of recidivism.

4. **18 U.S.C. § 3553(a)(2)(C): Protection of the public**

Mr. Zanetti does not present a danger of physical harm to the public. The offense was non-violent and financial in nature. Moreover, deportation ensures that he will not pose any future risk to the public in the United States. The need to protect the public therefore does not require a sentence at the high end of the advisory range.

5. **18 U.S.C. § 3553(a)(2)(D): Educational, medical, or correctional needs**

There is no evidence that an extended term of incarceration is necessary to provide Mr. Zanetti with correctional treatment or rehabilitation. To the contrary, lengthy incarceration followed by immigration detention serves no rehabilitative purpose and imposes significant costs without corresponding benefit. In fact, Mr. Zanetti has demonstrated an exceptional commitment to self-improvement and rehabilitation during his pretrial detention. The letters from the Indiana County Jail confirms he has had no disciplinary actions and has actively participated in

numerous programs, including Career Development, Drug and Alcohol, Re-Entry classes, Anger Management, Thinking for a Change, and the Nurturing Parenting Program. (Exhibit B) Furthermore, a letter from The Open Door details his consistent and leading participation in outpatient substance use treatment since October 2024, where he has "reflected on how substance use has affected his life, as well as led to his charges." (Exhibit C) This proactive engagement with treatment underscores his genuine remorse and determination to address the underlying issues contributing to his offense.

**6. 18 U.S.C. § 3553(a)(6): Avoidance of unwarranted sentencing disparities**

A critical and often overlooked factor in this case is the disparate impact of incarceration on deportable defendants. Mr. Zanetti is subject to an ICE detainer and will be deported upon completion of his custodial sentence.  As a result, he is ineligible for early release to a residential reentry center (halfway house) and ineligible for the Bureau of Prisons' good-time and prerelease mechanisms that routinely allow similarly situated defendants to serve approximately six months less than their imposed sentence.

While any term of imprisonment is a severe punishment, Mr. Zanetti faces a categorically harsher and more restrictive period of incarceration than a similarly situated U.S. citizen, directly undermining the sentencing goal of avoiding unwarranted disparities. This is a consequence of his non-citizen status and the associated U.S. Immigration and Customs Enforcement (ICE) detainer, which will trigger two significant penalties beyond the imposed sentence.

While some courts have held that the mere threat of deportation is not a permissible ground for a downward *departure* under 18 U.S.C. § 3553(b), Mr. Zanetti does not seek a departure based solely on the fact of deportation. Rather, he argues that the *collateral consequences* of his ICE detainer—ineligibility for First Step Act credits, disqualification from minimum-security

facilities, and the resulting harsher conditions of confinement—render the advisory guideline range 'greater than necessary' under the parsimony clause of § 3553(a). This is a substantive reason for a variance, not a departure request, and is therefore not precluded by *Alvarez-Cardenas* or its progeny."

First, Mr. Zanetti will be effectively excluded from the core rehabilitative incentive of the First Step Act. The Act is designed to reduce recidivism by rewarding inmates who complete programming with Earned Time Credits (ETCs) toward pre-release custody or supervised release. However, BOP policy has consistently excluded inmates with an ICE detainer—those subject to removal—from earning these credits. This policy renders Mr. Zanetti ineligible for the very credits that reward the positive behavior and rehabilitation he has already demonstrated and seeks to continue. Where a U.S. citizen co-defendant could shave months or even years off a sentence through good conduct and program completion, Mr. Zanetti must serve every single day of his term, punishing him not for the severity of his conduct, but for his nationality.

Second, the ICE detainer mandates a punitive and dangerous custody classification**.** Rather than being assigned to a lower security camps—the typical and appropriate placement for a first-time, non-violent offenders—BOP classification policy will place Mr. Zanetti in at least a much higher facility. This is not a discretionary choice; it is a direct result of the detainer. He will be housed in a more restrictive, prison-like environment with higher-risk inmates, significantly diminishing his access to rehabilitative programs and increasing his exposure to violence. This heightened security level is imposed solely due to his immigration status, creating a stark and unjust disparity in the *quality* and *safety* of the incarceration served.

In sum, the same sentence of 151-188 months represents a far more severe punishment for Mr. Zanetti than for a citizen. He is barred from early release incentives and condemned to a

harsher, more dangerous custodial experience. This Court can mitigate this built-in disparity by accounting for it under § 3553(a) and imposing a sentence that, in its ultimate effect, is "sufficient, but not greater than necessary." A downward variance is necessary to ensure the actual punitive and rehabilitative impact of Mr. Zanetti's sentence is proportionate to his offense and not unjustly inflated by his citizenship status.

## Related Codefendants

Granting a downward variance and imposing a sentence of 120 months would be more in line with sentences imposed on similarly situated co-defendants. Sentences for co-defendants who played comparable organizational roles and faced similar sentencing enhancements demonstrate that a variance is warranted here.

Dave Leblanc was a leader of a U.S.-based money collection team in the same grandparent scam conspiracy. Like Mr. Zanetti, his sentencing enhancements included those for being an organizer/leader (USSG §3B1.1), for the large number of vulnerable victims (USSG §3A1.1), and for a loss amount between $2,500,000 and $3,000,000 (which corresponds to a 16-level increase under USSG §2B1.1(b)(1)(I)). Leblanc's Presentence Investigation Report calculated a Total Offense Level of 32 and a guideline range of 121-151 months' imprisonment, almost identical to Mr. Zanetti's guideline range of 151-188 months. Despite the government's recommendation of a 121-month sentence, which was at the low end of the sentencing guidelines, the court sentenced Mr. Leblanc to only 37 months' imprisonment. (Exhibit D)

While Mr. Zanetti's role was more significant than some, warranting a longer sentence, the extreme disparity between a 151-month guideline minimum and the actual sentences of 37 and 46 months imposed on similarly enhanced leaders Leblanc and Audate is unwarranted. A variance to the proposed 120-month range would better achieve the goal of reasonable

11

uniformity and avoid a grossly disproportionate sentence compared to those of his co-conspirator leaders and manager. Indeed, a 120-month sentence, while a substantial downward variance, would still be more than triple the sentence imposed on the similarly situated related codefendant, Mr. Leblanc.

Codefendants in the Western District of Kentucky Prosecution, a parallel, large-scale grandparent scam conspiracy prosecuted in Kentucky, which also involved cross-border operations, Canadian call centers, and millions in losses, resulted in sentences for organizers that further illustrate the appropriate range.

Mark Anthony Phillips, identified as a "manager or supervisor" within that conspiracy, was sentenced to 70 months in prison. Notably, Mr. Phillips's case involved a higher guideline calculation than typical for the scam alone, as his sentence incorporated a separate money laundering conviction from New York involving an undercover sting and a six-level enhancement for believing the funds were drug proceeds. Mr. Phillips sentencing guidelines were 135 months to 168 months. Even with this more severe aggregation, his total sentence was only 70 months. (Exhibit E)

Christopher Courcoualcos, also identified as a "manager or supervisor," was sentenced to 6 years (72 months) in prison. (Exhibit F, *Kentucky Defendants)*.

Phillipe Gravel-Nadon, also identified as a "manager or supervisor," was sentenced to 5 years and 1 month (61 months) in prison. His sentencing guidelines were 87 to 108. (Exhibit F, *Doc. 364, Gravel-Nadon Sentencing Memorandum*).

While Mr. Zanetti's role was significant, the extreme disparity between a 151-month guideline minimum and the actual sentences of 37, 46, 61, 70, and 72 months imposed on similarly situated managers and leaders in related conspiracies is unwarranted. The case of Mr.

Phillips is particularly instructive, as it shows that even a defendant facing a *higher* composite guideline range due to unrelated, serious conduct received a sentence less than half of Mr. Zanetti's guideline minimum. A variance to the proposed 120-month range would better achieve the goal of reasonable uniformity and avoid a grossly disproportionate sentence. Indeed, a 120-month sentence, while a substantial term of imprisonment, would still be within the higher end of the spectrum of sentences given to organizers in these nationwide schemes, and would avoid the stark injustice of a sentence more than double that of his peers.

## IV. ANALYSIS UNDER BOOKER, GALL, AND KIMBROUGH

Under *Gall* and its progeny, the advisory guideline range is the starting point, not the endpoint, of the Court's analysis. The Court must make an individualized assessment based on the facts presented and impose a sentence that is sufficient but not greater than necessary. The parsimony clause of § 3553(a) requires restraint where additional punishment yields no additional societal benefit.

Here, the guideline range is driven by loss amount and role enhancements that, while technically applicable, result in a sentence far greater than necessary to achieve deterrence, punishment, and protection of the public—particularly given the certainty of deportation and the inability of Mr. Zanetti to benefit from ordinary sentence-reduction mechanisms.

## V. CONCLUSION

For all of the foregoing reasons, Mr. Zanetti respectfully requests that this Honorable Court impose a sentence at the low end of the advisory guideline range, or a downward variance below that range, taking into account the certainty of deportation and the substantial additional time he will serve compared to similarly situated defendants. Such a sentence would be sufficient, but

not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,


 s/ Steven C. Townsend
Steven C. Townsend, Esquire
Pa. ID #89263
Eddy Townsend Gravina & Bendik
Manor Building Penthouse
564 Forbes Avenue
Pittsburgh, PA 15219
(412) 281-5336
stownsend@pghlaw.com